Agnes, Peter W., J.
This is a derivative action, brought under Mass.R.Civ.P. 23.1, arising out of fiduciary duties, allegedly owed by the defendants, Melvin Rose, Inc. (“Melvin Rose”), Johnson Corrugated Products Corp. (“JCPC”), and Randy Johnson (collectively, “the defendants”), to Rule 19 party Melrose Associates Limited Partnership (“Melrose”). The plaintiff, Estate of Phyllis Johnson (the “plaintiff’), brings this seven-count action as a limited partner of Melrose, alleging breach of contract (Count I); breach of covenant of good faith and fair dealing (Count II); breach of fiduciary duty (Count III); misappropriation of corporate opportunities (Count IV); piercing the corporate veil (Count V); unjust enrichment (Count VI); and seeking an accounting (Count VII). The defendants now move for summary judgment in their favor pursuant to Mass.R.Civ.P. 56 on all counts of the plaintiffs complaint. For the reasons discussed below, the defendants’ motion is DENIED.

BACKGROUND

In accordance with the standard of review for summary judgment, all of the facts are presented in the light most favorable to the non-moving party.
In or around 1962, Melvin Johnson, husband of Phyllis Johnson and father of Randy Johnson, formed JCPC, with a manufacturing plant in Thompson, Connecticut. Melrose was created as a holding company for the JCPC real estate, including the Thompson, Connecticut manufacturing facility property. At Melvin Johnson’s death, Phyllis Johnson inherited Melvin’s eighty percent stock interest in each JCPC and Melrose, Inc., the corporate predecessor of Mel-rose.[2] Two trusts, Melvin Johnson Trust A (“Trust A”) and Melvin Johnson Trust B (“Trust B”), held the Melrose, Inc. stock after Melvin Johnson’s death. Later, when Melrose changed form from a corporation to a partnership, it named as general partners James Brown (“Brown”) and Frederick Witkowski (“Witkowski”). Brown and Witkowski also served as shareholders, officers, and directors of JCPC, and limited partners of Melrose. In 1992, Melvin Rose was created to replace Brown and Witkowski as general partner of Melrose.
In 1996, Phyllis Johnson, Randy Johnson, Brown, and Rule 19 Parties Lorene Johnson, David Johnson, Cindy Johnson, and James Johnson (“Rule 19 Family Parties”) agreed to dissolve Trust B (“Dissolution Agreement"). Pursuant to the terms of the Dissolution Agreement, Randy Johnson and Brown each became fifty percent owners of Melvin Rose, which would control Melrose. Also pursuant to the terms of the Dissolution Agreement, Phyllis Johnson and the Rule 19 Family Parties executed a general release and covenant not to sue (“1996 Release”) providing:
1. The Parties hereby release and forever discharge one another from any and all manner of actions, causes of action, suits, debts, accounts, contracts, claims, demands, agreements, controversies, judgments, obligations, damages and liabilities of any nature whatsoever whether or not now known, suspected, or claimed, which either of them ever had, now has, or hereafter may have, or claim to have, against the other by reason of any act, transaction, practice, conduct or omission of either of them or any matter, cause, effect, or thing of any kind whatsoever that arose or occurred prior to the date of this MUTUAL RELEASE AND COVENANT NOT TO SUE, including, but not limited to, any action, cause of action, suit, debt, account, contract, claim, demand, agreement, controversy, judgment, obligation, damage or liability of any nature whatsoever, arising out of, relating to, or based upon, in whole or in part, (a) any act, transaction, practice, conduct, omission, matter, cause, effect, or thing which is related to the Transaction, or (b) any act, transaction, practice, conduct, or omission of either of them or any matter, cause, effect or thing arising or occurring prior to the date of this MUTUAL RELEASE AND COVENANT NOT TO SUE, actionable or claimed to be actionable under any statutory or common law of the United States or any state thereof or (c) any cause or effect which existed or occurred, or presently exists, or may in the future exist or occur as a result of any act, transaction, practice, conduct or omission of either of them that occurred prior to the date of this MUTUAL RELEASE AND COVENANT NOT TO SUE, or (d) any other act, transaction, practice, conduct, *710 omission, matter, cause, effect or thing whatever that occurred prior to the date of this MUTUAL RELEASE AND COVENANT NOT TO SUE.
2. The Parties agree never to commence or prosecute against one another in any action or proceeding any demands, causes of action, obligations, damages, or liabilities of any nature whatsoever, whether or not now known, suspected or claimed, which either of them ever had, now has, or hereafter may have, against the other, by reason of any act, transaction, practice, conduct or omission of either of them that occurred prior to the date of this MUTUAL RELEASE AND COVENANT NOT TO SUE.
In addition, this case involves a second release, dating to 2002 (“2002 Release”). In 1992, Phyllis Johnson, who served as an officer and director of JCPC, allegedly made an inter vivos gift of approximately thirty-five shares in JCPC to Randy Johnson. In 1997, JCPC disputed the gift and initiated a lawsuit to determine the rightful owner of the shares. The case settled in 2002, with Phyllis confirming and ratifying the gift of stock to Randy, resigning from her position as an officer and director of JCPC, and executing a release in favor of JCPC and Randy. The 2002 Release, dated May 20, 2002, provided:
. . . Phyllis R. Johnson, for herself, her heirs, successors and assigns (collectively “Releasors”) hereby release and forever discharge Johnson Corrugated Products Corporation and Randy Johnson, their heirs, successors, assigns, officers, directors, agents and employees (collectively “Releasees”), of and from all debts, demands, actions, causes of actions, suits, accounts, covenants, agreements, damages, attorneys fees and any and all claims and liabilities whatsoever, of every name and nature, both at law and in equity, which against Releasees the Releasors how have or ever had from the beginning of the world to this date . . .
Paragraph 9 of the 2002 Release, however, states that “this Agreement is a full, final and complete release of all claims between and among the parties relative to the subject matter hereof’ and that:
This agreement shall have no effect upon the mutual rights and obligations of the parties hereto relative to Melrose Associates Limited Partnership (“Melrose”), a Connecticut limited partnership, or the lease dated November 23, 1993 (as amended) between Melrose and Johnson Corrugated.
Over time, Randy Johnson increasingly acquired more and more of JCPC stock, so that by 2002, Randy was the sole shareholder of the company. On May 31, 2002, Randy, as a 50% owner of Melvin Rose, mortgaged, pledged, and assigned the JCPC real estate and lease owned by Melrose to secure bank loans of $6.95 million for the benefit of JCPC (“2002 Loans”). The plaintiff argues that this mortgage enabled Randy and Melvin Rose to secure a guaranty of a $4.2 million term loan and a $1.25 million line of credit from the bank to JCPC, and a $ 1.4 million loan to Melrose to finance or refinance plant expansion of JCPC. In addition, on June 6, 2003, Melvin Rose pledged Melrose as guarantee for an additional term loan of $1.5 million to JCPC (“2003 Loan”). This loan was used to purchase a “Martin Machine” to improve productivity, reduce expense, and enable JCPC to be more competitive. On April 2, 2004, Melvin Rose amended the lease to fulfill conditions, enabling Randy to sell JCPC to Norampac, Inc. (“Norampac”) for $6.4 million, net of bank loans (“2004 Lease Amendment”).
The plaintiff argues that Melvin Rose, as general partner of Melrose, had a duty to notify the Melrose limited partners of, and to obtain their consent to, these transactions. In addition, the plaintiff argues that Randy breached his fiduciary duty to Melrose, as his transactions on behalf of Melvin Rose and JCPC constituted a conflict of interest with Melrose and self-dealing, which harmed Melrose. The defendants rebut that the 1996 and 2002 Releases protect them from these claims.

DISCUSSION

I. Summary Judgment Standard

Summary judgment is properly granted where there is no genuine issue of material fact, and the moving parly is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Nashua Corp. v. First State Ins. Co., 420 Mass. 196, 202 (1995); Cassesso v. Comm’r of Corr., 390 Mass. 419, 422 (1983); Cmty. Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of demonstrating affirmatively the absence of a triable issue and entitlement to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). This burden may be met by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege facts which would establish the existence of a genuine issue of material fact in order to defeat [the motion].” Pederson, 404 Mass. at 17. In reviewing the summary judgment record, this Court “must read the record in the manner most gratifying to the party opposing summary judgment, indulging all reasonable inferences in that party’s favor.” Newport Plaza Assoc. v. Durfee Attleboro Bank, 985 F.2d 640, 643 (1st Cir. 1993). As the party moving for summaiy judgment, the defendants have “the burden of affirmatively demonstrating that there is no genuine issue of fact on every relevant issue raised by the pleadings.” Mathers v. Midland-Ross Corp., 403 Mass. 688, 690 (1989), quoting Attorney Gen. v. Bailey, 386 Mass. 367, 371, cert. denied, 459 U.S. 970 (1982).
*711 II. The Scope of the Releases
The central issue is whether the plaintiffs claims fall within the scope of the 1996 and/or 2002 Releases. Interpretation of an unambiguous contract is a matter of law for the court. Lawrence-Lynch Corp. v. Dept of Envtl. Mgmt, 392 Mass. 681, 682 (1984). Where a contract, or in this case, a release, has ambiguous, uncertain, or equivocal meaning, the intent of the parties is a question of fact to be determined at trial. Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002). Release interpretation “turns on the ‘expectations and intentions of the parties, at the time of agreement with regard to the future effect of [the releases].’ ” Atlas Tack Corp. v. Crosby, 41 Mass.App.Ct. 429, 432 (1996), quoting Polaroid Corp. v. Rollins Envtl. Servs. (NJ), Inc., 416 Mass. 684, 694 (1993).
The language of the two releases involved in this case is in the form of a standard general release which is indicative of an intention by the parties to apply broadly to all claims that may exist or that could be made the subject of litigation. See Glendale Coal Co. v. Nesson, 312 Mass. 293 (1942). The defendants, in citing Atlas Tack, argue that consistent with broad coverage applied by courts to the terms of a general release such as the ones involved in this case a course of dealing had been established between themselves and the limited partners of Melrose, whereby the consent of the limited partners was never before required in certain practices, and therefore the 1996 Release, releasing “any . . . practice . . . arising or occurring prior to the date of the [1996 Release]” should be applied to future claims of the parties. In Atlas Tack, the court stated that “a general release, in terms as broad as those in (Atkis Tack], is to be given effect, even if the parties did not have in mind all the wrongs which existed at the time of the release.” 41 Mass.App.Ct. at 433. Similarly, in Eck v. Godbout, 444 Mass. 724 (2005), the Supreme Judicial Court recently considered the effect of a general release and, citing Atlas Tack, stated that “broad wording in the release operates to settle all other, unrelated matters, even if they were not specifically in the parties’ minds at the time the release was executed." Id. at 728 (citations omitted).
In this case, while the releases may very well protect the defendants against claims unrelated to the underlying transactions, each contains language of limitation that the releases in Atlas Tack and Eck did not. See id. at 729; Atlas Tack, 41 Mass.App.Ct. at 433. While the differences are subtle, they are nonetheless distinguishable. In Atlas Tack, the plaintiff discharged “from all manner of actions, causes of actions . . . which [the plaintiff] ever had, now has or which it or its successors hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of these presents.” Id. at 431. In the present case, under the 1996 Release, the plaintiff only released claims against the defendants based on acts, transactions, or practices “arising or occurring prior to the date of [the 1996 Release]” and, under the 2002 Release, claims against Randy Johnson and JCPC that the plaintiff had “to this date [May 20, 2002].” These limitations, duly noted at least five times in the case of the 1996 Release, make clear that the parties intended to limit the releases to claims resulting from acts, transactions, or practices occurring prior to the dates of execution of the releases. There is a fundamental difference between the legal effect of a general release as to claims that the parties did not specifically have in mind at the time of its execution but which are nevertheless covered by the broad language of the release because those claims existed at the time of its execution, see Eck, supra, 444 Mass, at 730-32, and a general release that specifically limits its broad coverage to claims arising or occurring prior to or as of a particular date like the releases in this case. In the latter case, the court is obliged to honor the express intention of the parties and limit the scope of the general release to those claims that existed at the time of or before the execution of the release.
This case is also distinguishable from Eck in that the analysis in Eck focused on the conjunctive “and” in the release, where the plaintiff released “all” claims “and” claims relating to a specific, named transaction. 444 Mass, at 729. In the instant case, however, the 1996 Release uses the conjunctive “or.” While it releases “any and all. . . claims,” it does so only to the extent that the act or occurrence on which they are based “occurred prior to the date of this [1996 Release].” Further, the operative effect of this limitation preceding the phrase “including, but not limited to, any action, cause of action . . .” is to provide that the act, omission, transaction, or practice on which the claims are based precede the date of the release. Here, there can be no mistake that the plaintiffs claims, relating to the 2002 Loans (dating May 31,2002), 2003 Loan (dating June 6, 2003), and 2004 Lease Amendment and sale of JCPC to Norampac (dating April 2, 2004), are based on transactions subsequent to the releases. Thus, notwithstanding similar past practices of the parties, the plaintiffs claims are not encompassed by either the 1996, or more recent, May 20, 2002, release.
Even if the 2002 Release could encompass the 2002 Loans, the defendants’ argument that Phyllis Johnson knew or should have known about the loans as a fiduciary of Melrose is without merit, as Paragraph 9 of the release clearly states that the release “shall have no effect upon the mutual rights and obligations of the parties hereto relative to [Melrose] . . .” As this is a derivative action brought on behalf of Melrose, the 2002 Release does not apply.
Because there is no ambiguity in the date limitation of either the 1996 or 2002 Release, the Court must *712 apply the plain meaning of the terms.[3] See Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997). Accordingly, the 1996 and 2002 Releases do not bar the plaintiffs claims.

ORDER

For the above reasons, it is therefore ORDERED that the defendants’ motion for summary judgment is DENIED.

Originally, Melrose was created as Melrose, Inc. Melrose, Inc. owned the JCPC Thompson, Connecticut properly until August 1983, at which time Melrose, Inc. changed from corporate to partnership form, to become Melrose Associates Limited Partnership.

Even if there is ambiguity, which this Court does not find, granting summary judgment is nonetheless improper, as the possibility of different interpretations is to suggest that there remains genuine issues of material fact.